IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. H-07-315 |
| | § | |
| CLEVELAND RIX III | § | |

## MEMORANDUM AND RECOMMENDATION

The United States seeks court authorization to medicate Cleveland Rix III against his will, in order to render him competent to stand trial.  Because the Government has failed to satisfy the requirements of *Sell v. United States,* 539 U.S. 166 (2003) by clear and convincing proof, this court recommends that the Government's request be denied.

## I.  Background

Cleveland Rix III is a 48 year-old Caucasian male currently charged in a three-count indictment with unlawful possession of a firearm after having been committed to a mental institution, in violation of 18 U.S.C. §§ 922(g)(4) and 924(a)(2).[1]  It is undisputed that Rix is presently incompetent to stand trial.

### A.    Procedural History

Rix was taken into federal custody pursuant to a criminal complaint[2] issued on July 2, 2007, and made his initial appearance before me on that date.  The Government moved for

---

[1]        Dkt. 9, Indictment, filed July 25, 2007.

[2]        The original case number was H-07-603M.

1

a psychiatric evaluation to determine his competency to stand trial, which Rix's appointed counsel did not oppose.  The order for mental competency examination was issued on July 6, 2007.[3]

On September 14, 2007, a forensic evaluation of Rix was completed at the Federal Detention Center in Englewood, Colorado.[4]  The evaluator, forensic psychologist David E. Morrow, Ph.D., diagnosed Rix as having "Delusional Disorder, Mixed type - Persecutory and Grandiose" as well as "Cannabis Abuse."[5]  He further concluded that "Mr. Rix **is** currently suffering from a mental disease or defect to the extent he is unable to understand the nature and consequences of the proceedings against him and to properly assist his defense."[6]  It was recommended that Rix be committed to a federal medical center for psychological treatment and psychotropic medication in order to restore competency pursuant to 18 U.S.C. § 4241(d).

This court held a competency hearing on October 25, 2007.  Neither the Government nor Rix's appointed counsel challenged the conclusion and recommendation of the forensic evaluation, although Rix himself disputed the findings.  Based on the forensic evaluation, as well as the court's own observation of Rix's uncooperative demeanor, Rix was found incompetent to assist in his own defense, and ordered committed in order to determine the

---

[3]     Dkt. 8.

[4]     Govt. Ex. A.

[5]     *Id.* at p. 6.  The report was reviewed and co-signed by Acting Chief Psychologist Jeremiah Dwyer.

[6]     *Id.* at p.9.

probability that within the foreseeable future Rix might attain sufficient capacity to permit the trial to proceed.[7]

Rix was then transferred to the Federal Medical Center in Butner, North Carolina, where he refused psychotropic medication to treat his mental condition.  A *Harper*[8] hearing was conducted by staff personnel on December 19, 2007, which concluded that Rix was neither gravely disabled nor an imminent danger to himself or others so as to justify involuntary medication on those grounds.[9]

The next day, a forensic evaluation of Rix was completed by staff psychiatrist Ralph Newman, M.D., declaring a diagnosis of "Schizophrenia, Paranoid Type, Continuous."[10] This diagnosis was contrary to the opinions of previous mental health providers (including the Government's own forensic psychologists at the Englewood Federal Detention Center), who had uniformly classified his mental condition as a delusional disorder.  Dr. Newman further opined "there is a substantial likelihood that with appropriate treatment [by psychotropic medications], Mr. Rix will improve to such an extent that his competency to

---

[7]     Dkt. 17, Order of October 26, 2007.

[8]     *Washington v. Harper*, 494 U.S. 210 (1990).

[9]     Govt. Ex. C.

[10]    Govt. Ex. D, p. 7. The evaluation was co-signed by the director of psychology training, Edward Landis III, Ph.D.

3

proceed may be restored."[11]  The evaluation concluded with a request for "judicial oversight" of a suggested protocol of involuntary medication pursuant to the Supreme Court's *Sell* decision.[12]  A formal request for involuntary medication was sent to this court by letter dated January 31, 2008 from the warden of the Butner Federal Correctional Complex.[13]

On February 25, 2008, District Judge Sim Lake referred the Government's request for involuntary medication to this magistrate judge to conduct an evidentiary hearing and submit proposed findings and recommendations for disposition.[14]

The *Sell* hearing was held on May 15, 2008.  Three witnesses testified at the hearing: ATF Special Agent Rozanna Teneyuque recounted background information concerning the alleged offense and the circumstances of Rix's arrest; Dr. Ralph Newman, forensic psychiatrist at the Butner Federal Medical Center, appeared as the Government's medical expert; and Dr. Victor Scarano, Chief of Forensic Psychiatry Services, Texas Law and Psychiatry, appeared as the defendant's medical expert.[15]  Documentary evidence was also received, and post-hearing briefs were submitted by June 16, 2008.

---

[11]     *Id.* at p.8.

[12]     *Id*.

[13]     Govt. Ex. E.

[14]     Dkt. 20.

[15]     A transcript of the *Sell* hearing was prepared and filed on July 23, 2008. (Dkt. 29.)

B.      **Rix's Mental Health History**

In 2003 a Burleson County, Texas court found Rix mentally incompetent to stand trial on charges of possession of a controlled substance.  Rix was then committed for restoration of competency to Austin State Hospital, where he was confined from October 23, 2003 to January 20, 2004.  During that time he was prescribed the psychotropic drug Zyprexa as treatment for certain persecutory delusions he displayed.  By the end of his commitment Rix's delusions had lessened, but not disappeared, and it was determined that Rix could not be restored to competency in the foreseeable future.  Upon discharge his mental condition was diagnosed as "Delusional Disorder - Paranoid Type," as well as "Cannabis Abuse" and "Narcissistic Personality Disorder."[16]  According to the Pretrial Services Report, the state charges against Rix were ultimately dismissed.

Rix insisted that he had been wrongly committed to the hospital and denied any mental health problems.  He attributed his mental illness diagnosis to a senile old doctor who had mistaken the word "artistic" for "autistic" in his medical chart.  He was angry about being medicated, and complained he had gained sixty pounds as a side effect of Zyprexa.  He vowed not to take psychotropic medication again.[17]  After discharge from Austin State Hospital, he was seen for a short time as an outpatient at Tri-County Health MHMR, where

---

[16]     These undisputed facts are taken from Govt. Ex. A, Forensic Evaluation of Cleveland Rix III dated Sept. 14, 2007, issued by the Federal Detention Center at Englewood, Colorado.

[17]     *Id*. at p. 5.

he refused to comply with his Zyprexa prescription.[18]  Rix has apparently received no further

mental health treatment since that time.

During his state confinement, and later during his federal confinement, Rix presented

an elaborate delusional system.  The core delusion is his belief  that his life was in danger

from the "Syndicate," which he described as a collection of white collar criminals, attorneys,

and judges involved in organized crime.  He claimed that he was an undercover law

enforcement agent involved in a dangerous mission to destroy the Syndicate, in which

capacity he is authorized to carry a gun and other law enforcement tools such as night vision

goggles and incendiary devices.  Other delusions include his beliefs that:

he founded SAFE House, a domestic violence shelter for abused women;

he has written over 100 country music songs to which others took the rights;

he is a published author;

he has written numerous screenplays for television and cinema;

he has been honored by Cambridge University based on these works;

he made money in California by "spinning a plot" to actor Jack Palance for
the movie eventually known as *City Slickers*;and

he  put that money in a retirement trust account which was  fraudulently withdrawn
by his mother and a male accomplice.[19]

---

[18]     Govt. Ex. D, at p.4.

[19]     Forensic Psychiatric Examination/Evaluation of Cleveland Rix III, prepared by Victor R.
Scarano, M.D., J.D. (April 3, 2008) submitted as Tab G of the Government's Exhibit

With the possibly significant exception of the retirement account,[20] these delusions are classified for diagnostic purposes as either persecutory or grandiose in nature.[21]

Rix's delusional thinking apparently played a role in the conduct leading to his arrest on the current charges.  An elderly couple in Huntsville, Texas, Mr. and Mrs. Marsh, filed numerous complaints with the Walker County Sheriff Department that Rix was engaged in threatening behavior such as stalking  and planting mailbox bombs.  Rix was arrested in the Marshes' neighborhood at 11:30 pm with two loaded firearms in his vehicle.  Rix explained that the Marshes owed him millions of dollars because they had stolen his musical ideas.  He also accused the Marshes of having two dead bodies buried on their property, which he had discovered when he found a tooth and a jaw bone while doing landscape work for them one day.  He came to believe that the Marshes posed a threat to him which justified his carrying the weapons.[22]

---

Notebook, pp.16-17.  Dr. Scarano is the defendant's medical expert.  Although this report was submitted to the court under seal prior to the hearing, it was not given an exhibit number. It is retrospectively designated as Defendant's Exhibit 3.

[20]      The Government's expert classifies this delusion as "bizarre" in support of his schizophrenia diagnosis, which Rix's expert vigorously disputes.  This issue is discussed in detail at pp. 11-12, *infra.*

[21]      Transcript [Tr.] at p. 67.

[22]      Tr. 8-14.

## II. Analysis

As a matter of constitutional due process,  Rix has "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper,* 494 U.S. 210, 221 (1990).  However, forced medication in order to stand trial for a serious crime may be constitutionally permissible where there is an "essential" or "overriding" state interest. *Riggins v. Nevada*, 504 U.S. 127, 134 (1992).  The Supreme Court in *Sell v. United States* devised a four-part standard for determining whether involuntary administration of drugs solely for trial competence purposes is appropriate: (1) *important* governmental interests are at stake; (2) involuntary medication will *significantly further* those governmental interests; (3) involuntary medication is *necessary* to further those interests; and (4) administration of the drugs is *medically appropriate, i.e.* in the patient's best medical interest in light of his medical condition.  539 U.S. 166, 180-81 (2003).

Although the *Sell* court did not specify the applicable burden of proof, the opinion indicated that the instances of involuntary medication "may be rare." *Id.*  In keeping with that observation, the Second Circuit has concluded that the government bears the burden of proving all questions of fact by clear and convincing evidence. *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004).  The Fifth Circuit has expressly endorsed *Gomes* as to the standard of appellate review of *Sell* decisions, *United States v. Palmer,* 507 F.3d 300, 303 (5th Cir. 2007), and district courts in this circuit have taken that as a signal to follow *Gomes* on the  clear and convincing burden of proof standard as well.  *See, e.g., United States v.*

8

*Reynolds*, 553 F. Supp. 2d 788, 791-92 (S.D. Tex. 2008) (Lake, D.J.).  Neither side contests

the imposition of this burden of proof upon the Government in this *Sell* hearing.[23]

## A.     First *Sell* Factor– Important Governmental Interest

Rix is charged with a three-count felony of possessing firearms after having been

committed to a mental institution.  The potential penalty for each count is up to 10 years in

prison and a $250,000 fine.[24]  Rix does not contest that there is an important governmental

interest in timely prosecuting such an offense.  *United States v. Palmer,* 507 F.3d 300, 303-

04 (5th Cir. 2007) (affirming trial court finding of important government interest in

prosecution of firearm possession by person committed to mental institution).  The first *Sell*

factor has been satisfied.

## B.     Second *Sell* Factor – Medication Significantly Furthers Governmental Interest

There are two prongs to this inquiry:  whether  medication is "substantially likely to

render the defendant competent," and  whether medication is "substantially unlikely to have

side effects that will significantly interfere with the defendant's ability to assist counsel in

conducting a trial defense."  *Sell,* 539 U.S. at 181.  Only the first prong is seriously contested

here.[25]  While reluctant to specify a particular percentage, courts have interpreted the phrase

---

[23]     Tr. 2-3;  Defendant's Brief at p.2 (Dkt. 23).

[24]     18 U.S.C. §§ 922(g)(4) and 924(a)(2).

[25]     While Rix also complains about the potentially serious side-effects of the medication, there
is no record evidence that such side effects would interfere with his ability to assist in his
own defense, as the second prong of the second *Sell* factor requires.  The Government has
accordingly met its burden with respect to this aspect of the second factor.

"substantially likely" to require something above a 50% chance of restoration.  *See Gomes,* 387 F.3d at 161-62 (70% chance of competency restoration deemed significant); *United States v. Ghane*, 392 F.3d 317, 320 (8th Cir. 2004) (10% chance of restoration is  merely a "glimmer of hope" and deemed not significant); *United States v. Rivera-Morales,* 365 F. Supp. 2d 1139, 1141 (S.D. Cal. 2005) ("a chance of success that is simply more than a 50% chance of success does not suffice to meet this standard").

Defendant's counsel vigorously challenges the efficacy of psychotropic medication to restore competency to mental patients such as Rix, who have been diagnosed with delusional disorder.  The Government response is twofold:  (1) that the correct diagnosis for Rix's mental condition is paranoid schizophrenia, which is very amenable to treatment via pyschotropic medication; and (2) alternatively, even if the proper diagnosis were delusional disorder, the proposed medication protocol is substantially likely to restore Rix to competency.  Each of these arguments will be considered in turn.

## 1.    Paranoid Schizophrenia vs. Delusional Disorder

Rix concedes that paranoid schizophrenia may be successfully treated with psychotropic medication, but stoutly denies that such a diagnosis correctly describes his mental disorder.  Both sides agree that the key to deciding between the competing diagnoses for Rix's mental condition turns upon  the proper classification of his delusions.[26]

---

[26]    At the hearing, the Government's expert advanced an alternative basis for ruling out delusional disorder as a diagnosis. Tr. 37-39.  Dr. Newman asserted that Rix did not satisfy Criterion C of the delusions disorder, which reads:  "Apart from the impact of the delusion or its ramifications, functioning is not markedly impaired or behavior is not obviously odd

According to the *DSM-IV-TR*,[27] if Rix has a "bizarre" delusion, then a diagnosis of delusional disorder is ruled out, and a diagnosis of schizophrenia can be made in his case. The *DSM IV-TR* describes a bizarre delusion as follows:

> Delusions are deemed bizarre if they are clearly implausible, not understandable, and not derived from ordinary life experiences (*e.g.*, an individual's belief that a stranger has removed his or her internal organs and replaced them with someone else' organs without leaving any wounds or scars).   In contrast, nonbizarre delusions involve situations that can conceivably occur in real life (e.g., being followed, poisoned, infected, loved at a distance, or deceived by one's spouse or lover).

*DSM IV-TR* at 324.   There are various types of bizarre delusions, such as "Capgras Syndrome," which is the belief that a close relative or friend has been replaced by an impostor who is an exact double (or *doppelganger*).[28]

Dr. Newman, a forensic psychiatrist at FMC-Butner, is the only mental health professional to diagnose Rix with schizophrenia.  He based that opinion upon the presence of a delusion which he classified as bizarre:  Rix believed that his mother used an exact

---

or bizarre." Tr.37-38 .  Dr. Newman opined that Rix's functioning has been impaired since 2003, citing his "deficits in employment" and estranged family relations.  However, because Rix's delusions directly concern both his employment as an undercover law enforcement officer and a family conspiracy against him, it is impossible to separate this impaired functioning from "the impact of the delusion or its ramifications."  For this reason, as well as the fact that this exclusion criterion was not specified in Dr. Newman's written forensic evaluation of December 20, 2007,  the court finds no clear and convincing evidence  to support this diagnostic theory.

[27]    American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision* (2000).

[28]    D. Ex.3, Scarano Evaluation,  p.18 n.4.

double of Rix to fraudulently withdraw money from his trust account.  In Dr. Newman's

opinion, this is a Capgras-type of delusion which could not happen in real-life.[29]

Dr. Scarano strongly disagrees with this interpretation of the delusion.  In his opinion,

Rix's belief that his mother conspired to take money from his account is part of a consistent

pattern of persecutory delusions.  Far from irrational or impossible in the real world, this

delusion has a sort of inner logic, as Dr. Scarano explains:

> What Mr. Rix believed was that his mother went to the bank and withdrew his
> retirement trust money. Mr. Rix knew, as a woman, she would not be able to
> get the money out of a man's account. Thus, to make sense out of this
> delusion, Mr. Rix surmised that his mother had to have a male accomplice.
> The male accomplice would have to be about his height and build, otherwise
> the bank teller or manager would get suspicious. . . . It is . . . entirely plausible
> and non-bizarre for Mr. Rix to believe that his mother employed a male co-
> conspirator to enable her to withdraw the funds from the retirement trust
> account.

D.Ex. 3, Scarano Evaluation, p. 17-18.

Given the *DSM IV-TR* definition of bizarre, Dr. Scarano's analysis is the more

persuasive.  While it is highly improbable that Rix's mother in fact enlisted a male

accomplice to access her son's trust account, stranger things have happened.  As expounded

by Dr. Scarano, Rix's delusion does not defy reality or ordinary life experience.  In sum,

there is no clear and convincing evidence that any of Rix's delusions are properly classified

as bizarre in the clinical sense.

---

[29]     Tr. 37; Govt. Ex. D, p.7.

Other considerations also undermine Dr. Newman's schizophrenia diagnosis.  As already mentioned, Dr. Newman is a minority of one on this issue.  Others who have treated or evaluated Rix at Austin State Hospital and FDC-Englewood, as well as Dr. Scarano, uniformly diagnose Rix with delusional disorder.[30]  In fact, Dr. Newman can also be counted among this majority view.  In a "progress note" dated 2/27/08, Dr. Newman listed Rix's diagnosis as "Delusional Disorder."[31]  This note  was written  two months <u>after</u> his forensic evaluation containing the schizophrenia diagnosis.

At the hearing, Dr. Newman sought to explain this inconsistency by noting that schizophrenia and delusional disorder are "extremely closely allied diagnoses."[32]  He then proceeded to hedge his schizophrenia diagnosis by admitting that delusional disorder would also be a "reasonable diagnosis."[33]  Dr. Scarano objected that the two diagnoses are not close, and pointed out that the *DSM IV-TR* precludes such a fence-straddling approach: "[I]f you have a bizarre delusion, the DSM-IV says you cannot make the diagnosis of delusional disorder."[34]  Dr. Newman's own forensic evaluation appears to confirm this point:

If [Rix] were to have bizarre delusions, fixed firm beliefs that would be impossible to occur in reality, the diagnosis of Delusional disorder would be

---

[30]     Govt. Ex. A. pp. 5-6.

[31]     D. Ex. 2.

[32]     Tr. 37.

[33]     Tr. 36.

[34]     Tr. 82.

ruled out. One of the exclusion criteria for delusional disorder is a bizarre delusion.

Govt. Ex. D,  p. 7.

Finally, the delusional disorder is partially corroborated by the failure of the initial attempt at competency restoration by the Austin State Hospital in 2003.   During that committal, Rix voluntarily took an anti-psychotic medication, Zyprexa, for approximately two months.  That medication did not restore his competency.  According to Dr. Scarano, if Rix was in fact schizophrenic, that medication would most likely have been successful.[35] While the record does not rule out other potential causes of failure — perhaps Rix was not fully compliant with the medication, or maybe a different dosage or longer treatment would have achieved better results — the lack of success of this earlier psychotropic medication is at least circumstantial evidence that Rix does not suffer from paranoid schizophrenia.

For all these reasons, the record does not support a finding by clear and convincing evidence that Rix is properly diagnosed with schizophrenia, paranoid type.  To the contrary, Rix is more likely than not suffering from delusional disorder, persecutory and grandiose type, as defendant's expert contends.

### 2.        Is Delusional Disorder Treatable By Medication?

Dr. Scarano testified that antipsychotic medications, such as those proposed for Rix, generally have a very low success rate in treating delusional disorders.[36]  This appears to be

---

[35]        Tr. 86.

[36]        Tr. 83.

the consensus view in the medical profession.  A standard textbook of psychiatry gives the

following assessment:

> Because delusional disorder is relatively uncommon, its treatment with
> antipsychotic medication has never been properly evaluated; anecdotal
> evidence suggests that response is poor. Antipsychotics may reduce the
> agitation and anxiety that accompany delusions, but leave the core delusion
> untouched.

Hales & Yudofsky, *Textbook of Clinical Psychiatry*, p. 426 (4th ed. 2002).

Other *Sell* cases involving challenges to the efficacy of psychotropic drugs in treating

delusional disorders have reached similar conclusions.  *See, e.g., United States v. Ghane*, 392

F.3d 317, 319-20 (8th Cir. 2004) (accepting expert conclusion that only 10% of patients with

delusional disorder experienced improvement with medication); *United States v. Lindauer*,

448 F. Supp. 2d 558, 568-72 (S.D.N.Y. 2006) (finding no clear and convincing evidence that

forced medication would restore the competency of the delusional defendant).

Acknowledging that "many people disagree with me,"[37] the Government's expert

maintained that psychotropic medication would be substantially likely to restore Rix to

competency, even assuming delusional disorder were the correct diagnosis.  Dr. Newman

based this opinion upon his own clinical experience in treating a larger than usual number

of patients with delusional disorder,[38] as well as a recently published study by two of his

---

[37]      Tr. 43, 63.

[38]      Tr. 40-43.

colleagues at FMC-Butner, Drs. Herbel and Stelmach.[39]  As explained below, neither of these grounds satisfies the Government's clear and convincing burden of proving that Rix is substantially likely to be restored to competency by antipsychotic medication.

Dr. Newman's testimony concerning his personal clinical success in treating delusional disorder patients was both brief and unenlightening.  His  broad statement that "[A]s my practice evolves, I see individuals with clear delusional disorder that respond to treatment,"[40] is unsupported by any statistical data whatever.  Nor did Dr. Newman provide much anecdotal support for his claim.  He refers to merely a single case, which he describes in merely  a single sentence:  "I recently finished a case diagnosed with delusional disorder, not competent to stand trial, medicated, and the inmate was restored to competency, and he is moving on with his legal situation."[41]  Of course, one swallow does not make a spring, and one successful instance of treatment tells the court nothing about the likelihood of success among delusional disorder patients in general, or  Rix in particular.

The Government purports to remedy that defect with the Herbel & Stelmach study, which was discussed at length in *Reynolds*, 553 F. Supp. 2d. at 797.  This study was a retrospective analysis of 22 case files of FMC-Butner inmates who had been diagnosed with delusional disorder from 1990 through June 2003..  The study concluded that over three-

---

[39]     Govt. Ex. B.

[40]     Tr. 54.

[41]     Tr. 42.

fourths (17) of these inmates had been restored to competency status after involuntary treatment with antipsychotic medication.[42]  The parties vigorously dispute the probative force of this study.   Several limitations are mentioned in the study itself:  (1) the lack of standardized clinical assessments may have resulted in mis-diagnosis of some patients who were thus wrongly included or excluded from the study population; (2) standard methods to reduce bias (such as a placebo control group) were not possible in a retrospective study,  so the opinions of the forensic examiners may have been biased towards a favorable outcome; (3) the sample size is small; (4) judicial records were not used to verify  competency status in the putatively successful cases.[43]

Rix particularly emphasizes the latter shortcoming as fatal to the study's credibility. The study's admission that "No attempt was made to verify the diagnosis or competency status retrospectively"[44] does not inspire confidence, given that the authors of the study are employees of the Federal Medical Center who are frequently called to testify on behalf of the Government in *Sell* proceedings.  This is not to demean their effort, which was a laudable attempt to shed light on an area in dire need of empirical data.  And the authors themselves do not claim to have definitively answered the question, as the concluding paragraph shows:

> Despite the limitations of this study, the results provide mental health professionals *some evidence* that most of the incompetent male defendants

---

[42]     Govt. Ex. B, p. 58.

[43]     *Id.* at 57-58.

[44]     Govt. Ex. B, p. 51.

with a diagnosis of delusional disorder, especially the persecutory subtype, will respond favorably to involuntary treatment with standard doses of first- and second-generation antipsychotic medications. *Additional research is needed to confirm and expand on these findings.*

Govt. Ex. B, at p. 59 (emphasis supplied). "Some evidence" is normally not equated with clear and convincing evidence.

Even so, it is unnecessary to decide whether this study alone could ever satisfy the Government's heavy burden for involuntarily medicating a delusional disorder patient. Taking the study on its own terms, Rix has not been shown to be among the subgroup of patients with the best likelihood of a good clinical outcome. According to the study, patients whose duration of untreated pyschosis (DUP) was less than ten years had an excellent success rate. Of nine individuals with a DUP of five years or less, seven were restored to competency; all six patients with a DUP between seven and ten years were restored to competency. By contrast, the success rate for individuals with a much longer untreated psychosis was only one in four, a "dismal" treatment response consistent with another published study. [45]

Rix's mental disorder was first diagnosed in 2003 at Austin State Hospital. Although the record does not definitively state when Rix first experienced pyschotic symptoms, several of his delusions pertain to events more than a decade ago. For example, he claims that he performed his first undercover law enforcement work at age 17 when he helped

---

[45]     Govt. Ex. B, p. 54.

police solve a pharmacy burglary in Huntsville, Texas.[46]  He also claims to have been deputized by the Burnet County Sheriff's Department in the early 1990's.[47]  Dr. Newman's own report declared that the diagnosis of schizophrenia was based on his "longstanding persecutory, grandiose, and bizarre delusions."[48]  Moreover, the report twice refers to Rix's lengthy DUP as a negative factor in his prognosis. Page 8 of the report states:  "His long-term prognosis is fair based primarily on his history of non-compliance, history of substance abuse, lack of insight, and *long history of untreated psychosis*"(emphasis supplied).  Again, at page 11: "His primary negative prognostic indicator is *an extended period of time of untreated psychosis*, history of cannabis and alcohol abuse, and lack of insight with an associated high risk of non-compliance"(emphasis supplied).[49]

It is reasonable to infer from these statements that Rix's history of untreated psychosis places him in the category of patients with a "dismal treatment response" of one-in-four,  to use the Herbel & Stelmach study's own phrase.  This competency restoration rate is inadequate to satisfy the second *Sell* criterion.  *See Reynolds*, 553 F. Supp. 2d at 797 (delusional defendant with untreated psychosis since 1982 not substantially likely to regain competency through forced medication).

---

[46]     D.Ex. 3, Scarano Evaluation, p. 5.

[47]     *Id*. at p. 6.

[48]     Govt. Ex. B, p. 7.

[49]     Govt. Ex. B.

The court thus concludes that the Government has failed to offer clear and convincing evidence that forced medication is substantially likely to render Rix competent to stand trial.

**3.     Third *Sell* Factor: Whether Antipsychotic Medication is Necessary to Further the Government's Interest**

In gauging the necessity of forced medication, the Supreme Court has instructed trial courts to consider whether "alternative, less intrusive treatments are unlikely to achieve substantially the same result." *Sell,* 539 U.S. at 181.  Dr. Scarano testified that the only proper treatment for Rix's delusional disorder is to develop a therapeutic relationship with his psychiatrist, which may take a year or more.[50]  In his opinion, forced medication would not help and would likely worsen the situation, because

> when you attempt to treat the individual against their will with medication, very often the individual will then incorporate you into their delusion, because you are now part of the persecutory structure that has been trying to hurt them and cause harm to them.

Tr. 84.  Dr. Scarano did not quantify the likelihood of a successful outcome with this therapeutic approach, although he believed it far more likely to be successful than forced medication in Rix's case.  This testimony was not effectively rebutted by the Government. To the contrary, Dr. Newman conceded that his clinical relationship with Rix is already "at an impasse" due to their disagreement over the  medication issue. Rix no longer speaks to Dr.

---

[50]     Tr. 84.

Newman, and believes that he has lied about Rix's delusions.[51]  This clinical impasse tends to confirm Dr. Scarano's opinion that forced medication may well be counterproductive here.

Thus,  a less intrusive form of therapy for Rix is available, which is no less likely to restore competency, and does not carry the risk of reinforcing his delusional disorder.  The court concludes that the Government has not proven the third *Sell* factor by clear and convincing evidence.

**4.      Fourth *Sell* Factor: Whether Forced Medication is Medically Appropriate**

The *Sell* Court defined "medically appropriate" as "in the patient's best medical interest in light of his medical condition." 539 U.S. at 181.  Relevant to this determination are the potential side effects of the proposed medication. *Id.*

The Government proposes to administer the antipsychotic medication Haldol decanoate.  Dr. Newman states that the side effects of Haldol "are most notable for movement disorders to include Parkinsonian effects, dystonic reactions, akathisia, and tardive dyskinesia."[52]   These side effects are entirely reversible upon discontinuation of the medication, with the significant exception of tardive dyskinesia.  This syndrome consists of involuntary, irregular combinations of writhing and jerking movements of the head, limbs, or trunk, but most often around the mouth and tongue.  The severity of the movements can

---

[51]      Tr. 52.

[52]      Govt. Ex. D, p. 10. Akathisia is "a condition of motor restlessness, ranging from a feeling of inner disquiet to inability to sit or lie quietly or to sleep." *Dorland's  Medical Dictionary*, p.50 (25th ed. 1974).

range from minimal to grossly incapacitating.  This Haldol side effect is delayed, rarely occurring until after six months of treatment, but then occurring at an incidence of 4% per year with a lifetime prevalence of approximately 30%. The longer the patient is on the antipsychotic, the more likely this side effect will occur.  While the condition can be managed, it is usually permanent.  "Unfortunately there is no effective treatment for tardive dyskinesia." [53]

This serious side effect, combined with the low probability that forced medication will restore Rix to competency and the high probability that it will simply reinforce his persecutory delusions, defeats the Government's claim that its proposal is in Rix's best medical interest.  The Government has failed to satisfy this fourth *Sell* factor by clear and convincing evidence.

### III.  Conclusion and Recommendation

The Government has failed to establish by clear and convincing evidence that forced medication is substantially likely to render Rix competent, that the medication is necessary to achieve that purpose, or that the medication is medically appropriate in light of his condition. The court concludes that the Government's attempt to restore the competency of Cleveland Rix III by forced medication is not constitutionally permissible under the standard imposed by *Sell v. United States,* 539 U.S. 166 (2003).  Accordingly, it is recommended that the Government's motion for involuntary medication be denied.

---

[53]      Govt. Ex. D, p. 11; Tr. 47.

The parties have ten days from service of this Memorandum and Recommendation to file written objections.  Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error.  *See* 28 U.S.C. § 636(b)(1).

Signed at Houston, Texas on August 1, 2008.


Stephen Wm Smith
United States Magistrate Judge

23